**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

GREGORY BROYLES,          )
                                 )
         **Plaintiff,**       )
                                 )
v.                             )     **Civ. Action No. 3:03CV1028**
                                 )
JO ANNE B. BARNHART,     )
COMMISSIONER OF SOCIAL   )
SECURITY,                 )
                                 )
         **Defendant.**      )

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the court pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment. Plaintiff Gregory Broyles seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of the Defendant Commissioner denying his application for disability insurance benefits (DIB). The Commissioner's final decision is based on a finding by an Administrative Law Judge (ALJ) that the Plaintiff was not disabled as defined by the Social Security Act (Act) and applicable regulations.

For the reasons discussed herein, it is recommended that the Plaintiff's Motion for Summary Judgment be GRANTED; the Defendant's Motion for Summary Judgment be DENIED; and that the Commissioner's decision be REVERSED with an award of benefits for the Plaintiff.

### Procedural History

Plaintiff filed his application for disability benefits under Title II of the Social Security Act on July 11, 2002 (R. at 40-42). The Plaintiff's application was denied on initial

1

consideration and upon reconsideration. (R. at 36). The ALJ denied Plaintiff's claim on July 17,

2003, following an administrative hearing that had been held on July 3, 2003. (R. at 149-167).

(R. at 12-19). Plaintiff's subsequent request for review by the Appeals Council was denied on

October 14, 2003 (R. at 3-6), by the affirmance of the decision of the ALJ as the "final decision"

of the Commissioner. Plaintiff timely commenced this action for judicial review pursuant to 42

U.S.C. § 405(g).

## Question Presented

Is the Commissioner's decision that the Plaintiff is not entitled to benefits supported by

substantial evidence on the record and the application of the correct legal standard?

## Standard of Review

In reviewing the decision of the Commissioner to deny benefits, the court is limited to

determining whether the Commissioner's decision was supported by substantial evidence on the

record and whether the proper legal standard was applied in evaluating the evidence. Hays v.

Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is more than a scintilla, less

than a preponderance and is the kind of relevant evidence a reasonable mind could accept as

adequate to support its conclusion. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing

Richardson v. Perales, 402 U.S. 389, 401 (1971); Laws v. Celebrezze, 368 F.2d 640, 642 (4th

Cir. 1966)).

In order to find whether substantial evidence exists, the court is required to examine the

record as a whole but may not "undertake to re-weigh the conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the Secretary." Mastro v. Apfel, 270 F.3d

171, 176 (4th Cir. 2001) (citing Craig, 76 F.3d at 589). In considering the decision of the

Commissioner based on the record as a whole, the court must "take into account whatever in the

2

record fairly detracts from its weight." Breeden v. Weinberger, 493 F.2d 1002, 1007 (4th Cir. 1974). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record or where the ALJ has made an error of law, the district court must reverse the decision. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation is required in order to determine if a claimant is eligible for benefits and the evaluation is based on a review of the claimant's work and medical history. 20 C.F.R. § 416.920; §404.1520 (2004); Mastro, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the Plaintiff was working at the time of application and, if so, whether the work constituted "substantial gainful activity" (SGA).[1] 20 C.F.R. § 416.920(b); § 404.1520(b) (2004). If a claimant's work equals SGA and is more than an unsuccessful work attempt, the analysis ends and the claimant must be found "not disabled" regardless of any medical condition. Id. If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or

_____

1. SGA is work that is both substantial and gainful as defined by the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Gainful work activity is work activity done for "pay or profit, whether or not profit is realized." Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572 (2004).

mental ability to do basic work activities." 20 C.F.R. § 416.920(c); § 404.1520(c) (2004).  In

order to qualify as a severe impairment that entitles one to benefits under the Act, it must cause

more than a minimal effect on one's ability to function.  Id.  If the claimant is not severely

impaired, the analysis proceeds to steps three through five.  Id.  At step three, if the claimant has

an impairment that meets or equals an impairment listed in Appendix 1, Part 404, Subpart P, and

lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying

impairment and the analysis ends.  20 C.F.R. § 416.920(d); § 404.1520(d) (2004).  If the

impairment does not meet or equal a listed impairment, then the evaluation proceeds to the

fourth step in which the ALJ is required to determine whether the claimant can return to part

relevant work[2] based on an assessment of the claimant's residual functional capacity (RFC)[3] and

the "physical and mental demands of work [the claimant] has done in the past."  20 C.F.R. §

416.920(e); § 404.1520(e) (2004).  If such work can be performed, benefits will not be awarded.

Id.  However, if the claimant cannot perform his past work, the burden shifts at the fifth step to

the Commissioner to show that considering her age, education and work experience, the claimant

---

2. Past relevant work experience is defined as SGA in the past fifteen years that lasted long
enough for an individual to learn the basic job functions involved.  20 C.F.R. § 416.965(a); §
404.1565 (a) (2004).


3. RFC is defined as "an assessment of an individual's ability to do sustained work-related
physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."
SSR-96-8p.  When assessing RFC the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a regular and continuing basis
(i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on the evidence available
in the case record.  Id.  (Footnote omitted).

is capable of performing other work available in significant numbers in the national economy.[4]

20 C.F.R. § 416.920(f); § 404.1520(f) (2004); Powers v. Apfel, 207 F.3d 431, 436 (4th Cir.

2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146, n. 5 (1987)); Hall v. Harris, 658 F.2d 260,

264 (4th Cir. 1981).  If the ALJ finds that the claimant is not capable of SGA, then the claimant

is entitled to benefits based on a finding of being disabled.  20 C.F.R. § 416.920(f)(1); §

404.1520(f)(1) (2004).

### Facts

Plaintiff, Gregory Broyles, was born April 16, 1964 (R. at 40), and was thirty-seven years

old when he filed for disability, alleging brain damage with short term memory loss, cerebral

palsy[5] in the right arm, right leg atrophy, and leg length discrepancy.  (R. at 54).  Plaintiff's

injuries are the direct result of an automobile accident at age two for which he was apparently

tracheotomized.  (R. at 105).  The record includes the examinations of Dr. Donald E. Bley, who

observed on August 19, 1981, when Plaintiff was seventeen years of age, that he walked with a

pronounced limp and had right lower leg atrophy (R. at 105).  Plaintiff had presented with post

traumatic headaches since his automobile accident for which Dr. Bley noted he struck "his head

against the top of the car, enough to tear the upholstery of the roof."  (R. at 105).  Dr. Bley also

---

4. The Administration may satisfy its burden by showing that considering the claimant's RFC, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2 (2004).  However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a vocational expert to determine whether an individual claimant is in fact capable of performing SGA available in significant numbers.  20 C.F.R. § 416.920(f); § 404.1520(f) (2004); Heckler v. Campbell, 461 U.S. 458, 466 (1983); SSR 83-10.

5. Generic term for various types of nonprogressive motor dysfunction present at birth or beginning in early childhood.  STEDMAN'S MEDICAL DICTIONARY 1300 (27th ed. 2000).

observed that the "Plaintiff [was] somewhat slow intellectually, probably as a result of auto accident at age 2." (R. at 105). On July 16, 1982, the record indicates that abnormalities on the CT scan were explained to Plaintiff's mother, but the information is included in the record. (R. at 105). Dr. Bley's radiographic report of January 19, 1993, when the Plaintiff presented with complaints of chest pain, showed a slight thoracic scoliosis, although no cause for chest pain was noted. (R. at 104).

On July 16, 2002, Dr. Bley assessed the Plaintiff with possible cerebral palsy. (R. at 103). He noted that Plaintiff had lost function in his right hand due to the auto accident and that he suffered from an "inability to fine manipulate right hand." (R. at 103). Dr. Bley indicated, however, that Plaintiff was left-handed. (R. at 103). Although Plaintiff's brain scans were normal, Dr. Bley referred him to a neurologist due to short term memory loss. (R. at 103).

On August 21, 2002, the Plaintiff saw neurologist Dr. Arnold J. Aguilera, complaining of right upper extremity spasms which "appear[ed] to have worsened in the past several months." (R. at 114). Dr. Aguilera's exam showed obvious right spastic hemiparesis,[6] memory and cognitive deficits, and right upper extremity flexor spasm secondary to posttraumatic brain injury. (R. at 115). However, while Dr. Aguilera noted Plaintiff's wife's comment that Plaintiff kept getting fired from jobs because he had difficulty following instructions, he also noted that Plaintiff was alert, oriented, and able to follow simple one- and two-step commands. (R. at 115). Dr. Aguilera's motor examination revealed "5/5 power at all muscle groups with the exception of the right grip which is 4+ and the right finger extensors 5-, but with markedly decreased coordination of the right upper extremity and markedly decreased fine finger movements on the

_____

6. Weakness affecting one side of the body. STEDMAN'S MEDICAL DICTIONARY 800 (27th ed. 2000).

right." (R. at 115).  Dr. Aguilera also observed that Plaintiff walked with a circumducting[7] right

hemiparetic gait.  He prescribed an initial trial of Baclofen[8] for Plaintiff's right upper extremity

spasms.  (R. at 114).

A subsequent head CT impression ordered by Dr. Aguilera on August 22, 2002, showed

"prominent left temporal encephalomalcia, minimal left subfrontal encephalomalcia," interpreted

as "compatible with the history of remote trauma and surgery."[9]  (R. at 113).   The impression

also showed possible inferior vermian hypoplasia.[10]   (R. at 113).  There was no hemorrhage or

mass-effect to suggest any acute process.  (R. at 113).

Plaintiff was referred to Dr. Nayyer M. Mujteba, a rehabilitation specialist, on August 27,

2002, for consultation concerning his cervical and upper thoracic pain and his difficulty in

ambulating.  (R. at 106-07).  Plaintiff again showed 5/5 motor strength on the left side, but 4/5 in

right upper extremity, 3+/5 in the intrinsic hand muscles, and only 1/5 for the right plantar[11]

flexors and dorsiflexors,[12] with the impression of "severe gait abnormalities secondary to

---

7. Movement of a part in a circular direction. STEDMAN'S MEDICAL DICTIONARY 354 (27th ed. 2000).

8. A muscle relaxant and antispastic agent used to relieve muscle spasms.  http://www.drugs.com (last visited April 8, 2005).

9. Encephalomalacia - Cerebromalacia; abnormal softness of the [brain tissue] due to ischemia (local anemia due to mechanical obstruction of the blood supply) or infarction (sudden insufficiency of arterial or venous blood supply).  STEDMAN'S MEDICAL DICTIONARY 587, 894, 924 (27th ed. 2000).

10. Underdevelopment of a tissue or organ usually due to a deficiency in the number of cells; or atrophy due to destruction of some of the elements and not merely to their general reduction in size. STEDMAN'S MEDICAL DICTIONARY 863 (27th ed. 2000).

11. The sole of the foot. STEDMAN'S MEDICAL DICTIONARY 1392 (27th ed. 2000).

12. Extensors in foot and toes; or hand and fingers.  STEDMAN'S MEDICAL DICTIONARY 537 (27th ed. 2000).

weakness, . . . and significant leg length discrepancy." (R. at 107). Neuromuscularly, Dr.

Mujteba observed that Plaintiff was alert and oriented (times three), with fluent speech and

appropriate behavior, though at times with flat affect. (R. at 107). Dr. Mujteba's exam showed

right seventh cranial nerve deficits, recent and remote memory deficits, and right hemianopsia,[13]

resulting in his conclusion that the Plaintiff "has higher level cognitive deficits secondary to

traumatic brain injury." (R. at 107). Dr. Mujteba prescribed Ultracet[14] for the Plaintiff's cervical

pain and a continuation of Baclofen for the spasticity. He also planned to fit Plaintiff with

orthotics and appropriate shoes to compensate for the leg length discrepancy as well as start

Plaintiff on physical therapy to work on his posture and range of motion. (R. at 107). Plaintiff's

pain had not yet improved at a follow-up examination some three weeks later (no specific date

provided). (R. at 108). The Plaintiff was only taking one Ultracet a day and had not yet started

the physical therapy, but he indicated that his spasticity was under control due to the Baclofen.

(R. at 108).

On October 2, 2002, Plaintiff returned to Dr. Aguilera and indicated that his right upper

extremity flexor spasms were nicely-controlled with the medication. (R. at 110). He had also

been fitted with a right MAFO brace and was receiving physical therapy with gait training. (R.

at 110). However, he stated that he still experienced neck pain and a cervical spine impression

showed moderate intervertebral disc space narrowing with associated minimal spondylosis.[15] (R.

---

13. Loss of vision for one half of the visual field of one or both eyes. STEDMAN'S MEDICAL DICTIONARY 798 (27th ed. 2000).

14. A combination of the pain relievers, acetaminophen and tramadol used for short-term management of pain. Seizures have been reported as a rare side effect of treatment with these drugs. *See* http://www.drugs.com (last visited on April 8, 2005).

15. Ankylosis (stiffening or fixation of a joint) of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. STEDMAN'S MEDICAL DICTIONARY 1678 (27th

at 111).  Another motor examination revealed 5- to 4+ strength in the right finger extensors, 4+ in the right grip, and 1+ in the reflexes.  (R. at 110).

In conjunction with Plaintiff's application for disability benefits, the Commissioner sent Plaintiff to Dr. June C. Wright-Good, Ph.D., for a consultative psychological evaluation on October 29, 2002.  (R. at 116).  Dr. Wright-Good administered several tests, including a Wechsler Adult Intelligence Scale (3rd Edition) (WAIS-III) that yielded a Full Scale IQ of 66 (R. at 118); a Bender Gestalt test, designed to confirm organic mental damage, yielding a score of 5 (the cutoff to look for organicity) (R. at 118); a Controlled Oral Word Association Test, resulting in a "defective" rating (R. at 117); and Trails A and B testing on which Plaintiff scored in the "deficient" range.  (R. at 117-18).  Notably, however, Dr. Wright-Good was unable to offer a diagnosis, observing that "on some occasions, [plaintiff] did not appear to be presenting his best effort," and she questioned whether Plaintiff may have been "trying to appear deficient." (R. at 117-18).  On the Block Design test, for example, even though he had the design correct, Plaintiff "moved the block to make it incorrect."  (R. at 117).  Dr. Wright-Good observed that although the Bender test suggested questionable brain damage, the Plaintiff should be reexamined by someone else, or that perhaps she was lacking medical information such as a CT scan or MRI that would tend to validate the existence of brain damage.[16]  (R. at 119).  She opined that "it

_____

ed. 2000).

16. Dr. Wright-Good also noted an inconsistency in Plaintiff's report since Plaintiff stated that his head went through the back window of the car in his accident and Dr. Bley had reported that his head impacted with the roof of the car.  (R. at 119).  In any event, it is an inconsequential difference, particularly because Plaintiff was only two years old at the time of the accident and the record supports the existence of his short-term memory loss and related injury from some type of impact.

would appear that [Plaintiff] could perform simple and repetitive tasks, and that he could attend work on a regular basis," but that he might need additional supervision.  (R. at 119).

On November 7, 2002, a Disability Determination Services (DDS) examiner, Dr. Sulaiha Mastan, reviewed Plaintiff's records and completed a Psychiatric Review Technique form (PRTF) (R. at 121-134).  Dr. Mastan addressed whether Plaintiff met or equaled Listing 12.02 of the Listing of Impairments, 20 C.F.R. § 404, Subpt. P, App.1, dealing with organic mental disorders.  (R. at 121).  Under the "A" criteria of Listing 12.02, Dr. Mastan found that Plaintiff had a cognitive disorder that did not precisely satisfy the diagnostic criteria.  (R. at 122).  He further found no restrictions in Plaintiff's daily living activities; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, findings that were insufficient to satisfy the "B" criteria.  (R. at 131).  Dr. Mastan also found that Plaintiff failed to satisfy the "C" criteria.  (R. at 132).

Dr. Mastan also completed a Mental Residual Functional Capacity Assessment (MRFC) on November 7, 2002 (R. 135-37), when he found no more than moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and respond appropriately to changes in the work setting.  (R. at 136).   Based on his 12.02 findings and a review of Dr. Wright-Good's exam, Dr. Mastan opined that the claimant would be able to engage in simple, repetitive tasks in a low stress environment.  (R. at 137).  Dr. Mastan's exam also noted that the "claimant's allegation of total inability to work due to chronic fibromyalgia and depression" were not credible (R. at 137), a comment that is puzzling and without any basis since there is no evidence in the record that Plaintiff ever complained of those ailments.

10

On November 8, 2002, another DDS physician, Dr. R.S. Kadian, completed a Physical Residual Functional Capacity Assessment (PRFC) (R. at 138-42) in which Plaintiff was found capable of lifting 20 pounds occasionally and 10 frequently; standing and/or walking about six hours in an eight-hour workday; and pushing and/or pulling to an unlimited degree. (R. at 139). Dr. Kadian observed that Plaintiff was limited in using his right hand for fine manipulation, but he also concluded that Plaintiff's claim that he could not use his right arm was not credible. (R. at 143). Ultimately, Dr. Kadian concluded, after reviewing Dr. Aguilera's and Dr. Mujteba's exams, that claimant could perform sedentary work, compatible with light work with fine manipulation restrictions. (R. at 146).

Plaintiff testified at the hearing before the ALJ on July 3, 2003, that he had difficulty standing for long periods of time due to his right leg weakness. (R. at 154). He explained that he had been fired from work as a cardboard baler for a moving company because he could no longer keep up the pace of work due to the need to take frequent breaks and the inability to use his right arm for the increasing amounts of baling he was being asked to do. (R. at 157-58). When the ALJ asked several times whether there had been any change in his condition such that he could no longer work, Plaintiff explained that he just got weaker and weaker every time he stood on his leg. (R. at 155-58). He also explained that he could not cut meat with his right hand; could not button a shirt (but he could hold the button with his right while he looped the hole around it with his left); could not hold a jar with his right and open it with his left unless it was loose; could not grab a full pitcher of tea with his right; could only use stairs with a hand rail, or by bringing his right foot up to meet his left; but that he did not require a cane, crutch, or other assistive devise. (R. at 159-61). He also testified that walking a long distance made his leg weak; that he was given a brace, but did not wear it because it hurt his ankles; that he was able to

11

make his bed, wash some clothes, and cook simple meals, but not handle a pot on the stove.  (R. at 162).  Finally, he testified that he was originally right handed, but switched to using his left after his accident.  (R. at 163-64).

### Analysis

The first step in the sequential analysis was resolved in the Plaintiff's favor by the ALJ's determination that the claimant "has not engaged in substantial gainful activity since his alleged onset date."  (R. at 13).  The second step was also resolved in the Plaintiff's favor by the ALJ's determination that the medical evidence indicated that Plaintiff has "residuals from a traumatic brain injury at age two.  He has right-sided spastic hemiparesis and temporal encephalomalacia . . . [which] are considered to be 'severe' within the meaning of the Social Security Regulations."  (R. at 14).  The ALJ then evaluated the severity of Plaintiff's impairments resulting from traumatic brain injury under Listing 11.18 and, by reference, Listings 11.04B and 11.00C, relating to central nervous system vascular accident, and Listing 12.02, pertaining to organic mental disorders.  (R. at 15-16).   The ALJ determined, however, that the impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (R. at 14).   Finally, the ALJ concluded that the Plaintiff had the residual functional capacity (RFC) to perform light work and that "he could return to his past relevant work as a cashier, a job which he has successfully performed for more than one employer."  (R. at 16-17).

Listing 11.18 mandates a finding of disability for an individual who has suffered cerebral trauma and satisfies the criteria of Listings 11.04 and 12.02, as applicable.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.18.  The ALJ first concluded that the record did not support a finding "that the claimant has more than moderate difficulty maintaining concentration,

persistence and pace or more than mild difficulty maintaining social functioning or performing activities of daily living" to fit the criteria for Listing 12.02.  (R. at 15, 16).  This conclusion was based on Dr. Mastan's report and is not contested by Plaintiff.[17]

At greater issue here is Listing 11.04, which specifically provides:

> **11.04 *Central nervous system vascular accident*.** With one of the following more than 3 months post-vascular accident: . . . **B.** Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)
>
> \*   \*   \*
>
> **11.00C *Persistent disorganization of motor function*** in the form of paresis or paralysis, tremor or other involuntary movements . . . . The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hand, and arms.

The Plaintiff's principle claim is that the ALJ applied an incorrect legal standard in his determination that Plaintiff's impairment did not meet or medically equal one of the impairments.  (Pl.'s Mem. Supp. Summ. J. at 9) (Pl.'s MSJ).  In evaluating Plaintiff's claim under 11.04B and 11.00C, the ALJ wrote:

---

17. However, the court wants to reemphasize that Dr. Mastan's report relied on "claimant's allegation of . . . chronic fibromyalgia and depression" which Plaintiff had not asserted as well as Dr. Wright-Good's psychiatric exam which left open a question of Plaintiff's efforts to perform the tests.  (R. at 137).  When a doctor's report leaves open a question as to a claimant's capabilities, the ALJ has a *duty* to adequately inquire into that issue by exploring all relevant facts.  *See, e.g.,* Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981) (holding that a reviewing court may exercise its power to remand for the taking of additional evidence where the ALJ failed to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts").  The ALJ did not scrupulously inquire into the qualifications of Dr. Wright-Good's report.  Assuming the tests performed for Dr. Wright-Good *were* accurate, Plaintiff proved deficient in nearly every category, with a full scale of 66 on the WAIS-III and 62 on the GAF that demonstrates mild mental retardation.  Additionally, the medical record contains substantial proof that Plaintiff suffered from memory lapses and cognitive deficits.  (R. at 107, 110).

> As indicated, the assessment of impairment depends on the degree of interference with cognitive functioning, locomotion and/or interference with the use of fingers, hands and arms.  Although some of the Listing criteria are met, the claimant has had the limitations since a very early age.  The degree of interference with cognitive and neurologic functioning clearly was not such as to prevent the claimant from completing his schooling and successfully performing substantial gainful activity for many years.  In the judgment of the undersigned, the record documents neither recent worsening of the condition so as to meet a pertinent Listing nor additional medically determinable impairment(s) that, singly or in combination, preclude work.

(R. at 16).  Plaintiff argues that the ALJ inappropriately relied on the absence of a "recent worsening" in Plaintiff's condition to preclude him from qualifying for that Listing.  (Pl.'s MSJ at 10).  The Listing does not require such a finding and the Plaintiff argues that ALJ failed "to recognize that some individuals can doggedly overcome conditions and work, notwithstanding the debilitating degree of problems they may have."  (Pl.'s MSJ at 10).

In support of his position, Plaintiff cites Luckey v. U.S. Dept. of HHS, 810 F.2d 666, 669 (4th Cir. 1989), wherein it was held: "When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap."  See also Murphy v. Bowen, 810 F.2d 433, 438 (4th Cir. 1987); Powell v. Heckler, 773 F.2d 1572, 1575 (11th Cir. 1985) (holding that it was not enough for the ALJ to justify a denial of benefits based on the claimants ability to work for at least short periods of time).  The Eleventh Circuit, in Powell, also observed that an otherwise disabled person "who manages somehow to secure employment will pass into and out of eligibility for benefits when ceasing or embarking upon 'substantial gainful activity.'"  Id. at 1576.

Plaintiff further argues that where a medical listing (specifically Listing 11.08) would otherwise apply to Christopher Reeve, the noted actor who became permanently paralyzed from

the neck down after falling from a horse, "the fact that Mr. Reeve returned to television work would somehow negate the fact that his condition plainly *continues* to meet the requirements of the Listing." (Pl.'s MSJ at 12) (emphasis added).

Plaintiff contends that, contrary to the ALJ's decision, his condition does meet the requirements of Listings 11.18 and 11.04 because the "plethora of objective clinical findings" set forth in the record clearly demonstrate the "disorganization of motor function in two extremities" required by the statute. (Pl.'s MSJ at 12). While Plaintiff observes that the Listing requires the disorganization to be both significant and persistent, the heart of Plaintiff's argument lies in the meaning of the word "significant." (Pl.'s MSJ at 12).

Since Listings 11.04B and 11.00C do not specify the "degree of interference with locomotion . . . " nor the amount of "significance" required to meet the Listing, Plaintiff makes reference to case authority that defines "significant" with regard to other listings and regulations. *See* Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (finding an impairment "not severe," that is, not "significantly limiting" the physical or mental ability to do basic work activities under 20 C.F.R. § 404.1520(c), only if it is a slight abnormality with minimal effect on the individual); Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985) ("An impairment imposes significant limitations when its effect on a claimant's ability to perform 'basic work activities' is more than slight or minimal."); *and* Branham v. Heckler, 775 F.2d 1271, 1273 (4th Cir. 1985) (finding that a "significant" limitation under 12.05(C) need not be disabling in and of itself or it would render the regulation meaningless). (Pl.'s MSJ at 13-16).

Defendant, on the other hand, contends that the ALJ's analysis was entirely proper and in accordance with the applicable Listings. (Def.'s Br. Supp. Cross-Summ. J. at 11) (Def.'s Cross). Defendant argues that the ALJ correctly emphasized the fact that Plaintiff successfully

performed substantial gainful work for at least fourteen consecutive years despite his physical ailments, thereby demonstrating an absence in "persistent disorganization of motor function" required by Listings 11.04B and 11.00C.  (Def's Cross at 12).  Defendant suggests that Plaintiff's concentrated focus on the meaning of the term "significant" fails to address the persistence of his ailments and that the record demonstrates that Plaintiff was able to use his dominant hand to perform such work as baling cardboard, making the bed, washing clothes, and cooking.  (Def.'s Cross at 13).  Defendant finally distinguishes the case of Christopher Reeve as one where the actor participated merely as a relatively inactive producer after his accident whereas Plaintiff participated in a more active role as a cashier before and could do so again. (Def.'s Cross at 14).

Defendant's argument overlooks the reference to Mr. Reeve that was simply utilized to demonstrate that the ALJ cannot proceed to find non-disability if the claimant's impairment meets or equals those contained in the Listing of Impairments, 20 C.F.R. § 404, Subpt. P, App. 1. 20 C.F.R. § 404.1520(d) (2004).[18] In other words, the mere fact that Plaintiff's condition has not worsened since the period of time when he was able to obtain and perform substantial gainful activity does not prevent his current impairment from meeting a medical listing.  *See* Luckey, 890 F.2d at 669; Murphy, 810 F.2d at 438; Powell, 773 F.2d at 1575.  Stated more simply, if an impairment meets a listing, it meets a listing.

Secondly, although the law requires that every element of the Listing must be satisfied in order to meet a listing, Sullivan v. Zebley, 493 U.S. 521 (1990), Plaintiff's emphasis on what is

---

18. The court also feels that the distinction drawn by Defendant is inaccurate since Mr. Reeve did perform several acting jobs following his accident which indicated a return to his past relevant work. *See* http://www.imdb.com/.  The court also declines to speculate upon whether the daily work of a producer is less active than that of an actor.

"significant" rather than "persistent" stems from the ALJ's failure to itemize what criteria in the Listing were met. The ALJ states merely that "some of the Listing criteria are met." (R. at 16). The court concludes that a debate over whether Plaintiff's injury failed to be significant or persistent is unnecessary. A proper reading of Listing 11.04B shows that "significant and persistent disorganization" modifies only "motor function in two extremities." There can be no doubt that Plaintiff's entire right side was subject to the traumatic brain injury he had sustained in young childhood. Plaintiff's right side includes his right hand, right fingers, right leg, and right toes, more than the requisite number of extremities to be afflicted.

Defendants argue further that Plaintiff did not meet the requirement of 11.00C because the language of that Listing refers to the ability to use fingers, hands, and arms *in the plural*, and that Plaintiff was still able to use his dominant hand. (Def.'s Cross at 13). However, the "persistent disorganization of motor function" referenced in 11.00C relates back to 11.04B with regard to the "two extremities"(or more) that have been affected. It is therefore insignificant that Plaintiff was able to overcome total disorganization simply because he could use his left hand.[19] Defendant's argument that Plaintiff's disorganization was not persistent plainly ignores the obvious fact that Plaintiff has experienced significant limitations in his mobility since he was only two years old.

The Listing also requires that there be "sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. § 404, Subpt. P, App. 1, Listing 11.04B. The record is clear that Plaintiff suffered from leg length discrepancy and a circumducting gait. (R. at 54,

_____

19. Furthermore, the court believes Plaintiff most likely became left-handed out of necessity following the accident at an age of significant childhood development.

107, 114).  Thus, the facts do not support a finding that Plaintiff met that portion of the Listing as well.

Finally, while the Listing does not require a "recent worsening," the record appears to show that according to Plaintiff's complaints, his condition *was* worsening.   Indeed, he stated in his disability report that everything he did took much longer than before he became unable to work.  (R. at 87).  Any activities that he continued, despite his disability, have been interrupted by the exacerbation of his symptoms.  (R. at 87).  The doctors' records also indicate that Plaintiff complained of frequent exacerbation when standing or sitting.  (R. at 106, 114).  Of significance to the assessment of the credibility of Plaintiff's complaints, but not addressed by the ALJ is a letter dated June 4, 2003, from David L. Coman, the director of the Department of Social Services for King George County, Virginia, who interacted with Plaintiff as an Employment Counselor for twelve years over the course of his disability.  (R. at 101-02).[20] In his statement, Mr. Coman observed that:

> [Twelve] years ago, Greg was a highly motivated individual who had very strong work ethic.  He over compensated for his physical limitations by working harder, longer and overcoming obstacles you and I do not normally encounter.  As a result of the years of hard work, I have seen him decline in his mobility, observed his physical limitations as the result of the pain he encounters with any kind of strain, as in getting up from a chair to lifting moderately heavy items.  He no longer is able to cope as well with the discrimination that he has encountered over the years and the stress from the years of abuse is apparent in his changing social skills. Greg is in decline physically and mentally.  When I speak with him, he is evasive and now turns inward.  When we talk about issues, he has obvious short-term memory lapses that impact our conversations.

---

20. Mr. Coman represents the King George Board of Supervisors on the Rappahannock Area Regional Disabilities Services Board and interacts with countless organizations and service providers for the disabled.  (R. at 102).

(R. at 102).  Such statements validate the fact that Plaintiff had a severe condition that prevented

him from working at the level of his peers and that his condition was gradually worsening with

the consequence that he was unable to perform at what once was "his best."  The condition

persisted from the date of the accident years before, and although Plaintiff struggled against all

odds, he could not overcome the obstacle.  Accordingly, the ALJ's finding that the Plaintiff has

failed to meet a listing is not supported by substantial evidence and the record appears to be

uncontroverted that the requirements of 11.18 have been met.  Therefore, the court recommends

that the case be remanded to the Commissioner for the direct payment of benefits.

     While an award of benefits can be sustained solely on the evidence that Plaintiff met a

Listing, the court deems it appropriate to address the remaining portion of the ALJ's analysis

concerning Plaintiff's ability to perform his past relevant work as a cashier.  Specifically, the

ALJ determined that Plaintiff could:

> . . . occasionally lift and/or carry up to 20 pounds at a time and
> frequently lift and/or carry up to 10 pounds, standing and/or
> walking with normal breaks for about six hours in an 8-hour
> workday and sitting with normal breaks for about six hours in an
> 8-hour workday.  The claimant cannot use his dominant hand to
> grip or perform fine manipulations.  Cognitively, the claimant
> retains the ability to perform at least unskilled tasks.

(R. at 18).

     Plaintiff argues that the job of "Cashier II" (DOT# 211.462-010) is defined in the

Dictionary of Occupational Titles as a "light" job, requiring frequent reaching, handling and

fingering (R. at 94), and that the nature of a cashier is to use both hands on a near-constant basis.

(Pl.'s MSJ at 18).  Although Plaintiff doesn't address it, the court notes as well that Plaintiff's

work history report includes descriptions of cashier jobs that daily involved two hours of

walking, eight to nine hours of standing, one to six hours of stooping, and seven hours of

handling, grabbing or grasping large objects.  (R. at 72-74).   The significance of such evidence

is that the record contains further complaints by Plaintiff that he was unable to stand or sit for a

long period of time and that his pain was most severe when he was doing such activities.  (R. at

77, 84).

Defendant argues, on the other hand, that the ALJ properly considered:  1) Plaintiff's past

relevant work; 2) Plaintiff's RFC; and 3) whether Plaintiff was able to perform his past relevant

work as outlined in Social Security Ruling 82-62.   (Def.'s Cross at 14).  Defendant argues that

the ALJ's decision that Plaintiff retained the RFC to perform the exertional demands of less than

the full range of light work was amply supported by the medical evidence and Plaintiff's

statements regarding his daily activities.  (Def.'s Cross at 15).

While it is true that Dr. Wright-Good and the two DDS physicians found that Plaintiff

retained the capacity to perform a limited range of light work with fine manipulation restrictions

in the right hand, and that Plaintiff's daily activities involved looking after his three year old

daughter, making light meals, and dressing himself, the ALJ failed to consider Plaintiff's

subjective complaints of pain as well as the potential requirements of Plaintiff's past relevant

work.

When assessing a claimant's pain in the context of determining RFC, an ALJ must

conduct a two-part analysis.  First, he must find a "medically determinable physical or mental

impairment . . . that could reasonably be expected to produce the individual's pain or other

symptoms."  SSR 96-7p.  Second, "the adjudicator must evaluate the intensity, persistence, and

limiting effects of the individual's symptoms to determine the extent to which the symptoms

limit the individual's ability to do basic work activities."  SSR 96-7p.   In making this second

evaluation, the ALJ may not simply disregard allegations concerning intensity and persistence of

pain or other symptoms "*solely because they are not substantiated by objective medical evidence.*"  SSR 96-7p (emphasis in original).  *See also* <u>Craig</u>, 76 F.3d at 591 (holding that Plaintiff need not produce objective evidence of the pain itself, as long as he has shown that he is afflicted with an impairment reasonably likely to produce the pain alleged).   However, whenever the individual's statements about the effects of the pain are *not* substantiated by objective medical evidence, "the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  SSR 96-7p.

Here, there is no question that the claimant has proven the existence of a medical condition that is reasonably likely to cause pain.  The ALJ correctly acknowledged "the existence of medically determinable impairments reasonably likely to cause some of the symptoms and limitations alleged by the claimant."  (R. at 17).  However, the ALJ failed to consider Plaintiff's subjective complaints of pain or weakness in making his determination.  (R. at 17).  Rather, he questioned Plaintiff's credibility by referring to Dr. Wright-Good's report that inferred that Plaintiff was trying to appear deficient, and by making the "same observation" at the hearing.  (R. at 17).

However, SSR 96-7p mandates that "the adjudicator make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements."  Recognizing that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, the adjudicator must consider, in addition to the objective medical evidence:

> 1) The individual's daily activities;
> 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3) Factors that precipitate and aggravate the symptoms;

4) The type, dosage, effectiveness, and side effects of any
medication the individual takes or has taken to alleviate pain or
other symptoms;
5) Treatment, other than medication, the individual receives or has
received for relief of pain or other symptoms;
6) Any measures other than medication, the individual receives or
has received for relief of pain or other symptoms; and
7) Any other factors concerning the individual's functional
limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

Plaintiff complained on multiple occasions of the pain in his arm, back, and neck.  (R. at

81, 82, 84).  He reported being unable to do many things of interest due to pain and spasticity.

(R. at 80).  Although he has a driver's license and he drove a taxi cab for a time, he needs help

getting in and out of a car and his wife has taken over all driving activities.  (R. at 80, 99, 152-

53).  His wife also handles all of the household finances and chores (both inside and outside), as

well as the bulk of child-rearing, since the Plaintiff is unable to take care of any personal needs

without difficulty.  (R. at 81, 87, 99).  He has difficulty sleeping at night and must take naps

during the day because he suffers from bad headaches and back aches.  (R. at 99).  Although he

had good attendance at work, the Plaintiff was unable to maintain employment because he was

only able to work with one hand, and if he sat or stood for more than fifteen minutes at a time,

his *left* leg and foot would go completely numb, presumably from the stress.  (R. at 99).   His

right leg would "just get weaker and weaker every time I'd stand on it.  And I'd have to, you

know, like I said, take breaks."  (R. at 158).

The objective medical record also shows that Plaintiff complained of post-traumatic

headaches to Dr. Bley at age seventeen.  (R. at 105).  The complaints continued through his

follow-up examinations with other doctors.  Dr. Mujteba observed that Plaintiff had had cervical

pain for more than ten years, "constant, dull, and achy in nature," reporting frequent

exacerbations when the pain was 10/10 on the pain scale.  (R. at 106).  Since Plaintiff was taking

only Tylenol and Advil when he saw Dr. Mujteba, he was prescribed Ultracet, a stronger, more

effective drug for pain.  (R. at 107, 108).  Dr. Aguilera noted that Plaintiff complained of neck

pain as well, although he assessed it as musculoskeletal.  (R. at 110).  He remarked that it was a

chronic neck and interscapular pain with rare radiation into the upper left arm, and that such pain

was exacerbated by prolonged sitting.  (R. at 114).  Dr. Wright-Good reported Plaintiff's chronic

neck, back, and interscapular pain as well.  (R. at 114, 117).

Plaintiff's complaints of pain were consistent and significant, yet the ALJ failed to

consider them.  (R. at 17).  Instead, the ALJ relied on the opinion of Dr. Wright-Good, who,

lacking objective CT scans or MRIs to fully evaluate Plaintiff's condition, notably left open the

issue in her analysis.  (R. at 119).  He further relied on Dr. Mastan's MRFC which was a fill-in-

the box form and based almost entirely on Dr. Wright-Good's determination, without an

additional examination, tests or records being conducted or gathered.  (R. at 137).  The PRFC

upon which the ALJ relied was also a fill-in-the-box form completed by Dr. Kadian, who never

examined the Plaintiff and which as also completed without any treating or examining source

statements on file. (R. at 144).  Thus, although SSR 96-6p allows the opinions of state agency

physicians to be treated as expert opinions, and there are no RFCs completed by Plaintiff's

treating physicians in the record, there is not substantial evidence to sustain the ALJ's failure to

probe more deeply into the Plaintiff's credibility regarding his employment capabilities.  *See*

Walker, 642 F.2d at 714.

### Conclusion

If the case were to be remanded, it would be recommended that the ALJ be instructed to

consider Plaintiff's complaints of pain and inquire into medical record deficiencies more

thoroughly in any further analysis.  However, because the matter can be resolved on the issue of whether the Plaintiff's substantiated impairment qualifies under a Listing, it is recommended that the Plaintiff's Motion for Summary Judgment be GRANTED outright; the Defendant's Motion for Summary Judgment be DENIED; and that the decision of the Commissioner be REVERSED with an award of benefits to the Plaintiff.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

It is so Ordered.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge


Date:_____